UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
UNITED STATES OF AMERICA *ex rel.*
PATRICIA MOONEY,

          **MEMORANDUM AND ORDER**
          06-CV-1806 (FB) (VVP)

        Plaintiff,

    -against-

AMERICARE, INC., a New York Corporation;
AMERICARE CERTIFIED SPECIAL
SERVICES, INC., a New York Corporation;
AMERICARE THERAPY SERVICES, a New
York Corporation; MARTIN KLEINMAN, an
individual; DAVID HELFGOTT, an individual;
SHAINDY INZLICHT, an individual; and
DOES 1-100, inclusive,

        Defendants.

--------------------------------------------------------------x

*Appearances:*
*For Plaintiff-Relator (qui tam):*       *For Defendants:*
JONATHAN A. WILLENS, ESQ.      PATRICK J. GREENE, JR., ESQ.
Jonathan A. Willens, LLC         Peckar & Abramson, P.C.
217 Broadway, Suite 707          70 Grand Avenue
New York, NY 10007            River Edge, NJ 07661

*For Plaintiff-Relator (retaliation):*
RICHARD BERNSTEIN, ESQ.
McInnis Law
521 Fifth Avenue, 17th Floor
New York, NY 10175

*For the United States:*
LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
By: ERIN E. ARGO, ESQ.
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

Plaintiff-relator Patricia Mooney brings this action under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the New York False Claims Act ("New York FCA"), N.Y. State Fin. Law § 187 *et seq.* She raises the following *qui tam* claims on behalf of the United States for alleged violations related to Medicare and Medicaid: (1) violations of the FCA, (2) conspiracy to violate the FCA, and (3) violations of the New York FCA.[1] Plaintiff alleges two fraudulent schemes, one involving the payment of kickbacks in exchange for referrals, and one involving the alteration of documents to justify home health services. Plaintiff also asserts a retaliation claim under the FCA, alleging that she was harassed and ultimately fired for investigating this conduct. She asserts these claims against Americare, Inc., Americare Certified Special Services, Inc. ("Americare CSS"), Americare Therapy Services, Martin Kleinman, David Helfgott, and Shaindy Inzlicht. Defendants have moved to dismiss the Third Amended Complaint ("TAC"). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## I.

Defendants provide home health nursing services to patients living in private residences and residential adult care facilities. TAC ¶ 2. Plaintiff worked for Americare CSS from 2002 to 2005 as a Staff Development Manager and later as the Director of Quality Improvement. *Id.* ¶ 8. She claims that she "was responsible for . . . reviewing Americare's

---

[1]Pursuant to 31 U.S.C. § 3730(b)(4)(B), the United States has elected not to intervene, though it remains an interested party.

Medicare and Medicaid billings to ensure compliance with applicable regulations," *id.* ¶ 46, and that in this role she "learned of defendants' scheme to defraud Medicare and Medicaid by (1) fraudulently obtaining and supplying hundreds of patients in exchange for the payment of illegal kickbacks; and (2) using false and fraudulent documents to support false reimbursement claims made to Medicare and Medicaid for skilled nursing services," *id.* ¶ 47. Plaintiff contends that defendants conspired with third-party vendors Royal Home Care ("Royal") and Immediate Home Care ("Immediate") to carry out the fraudulent referral scheme. *See id.* ¶¶ 49-51. She states that "hundreds of thousands, if not millions, of dollars in Medicare and Medicaid funds" were wrongly paid by the government. *Id.* ¶ 121. Plaintiff also claims that she was fired for objecting to this conduct and calling it to the attention of management. *Id.* ¶¶ 111-15.

Plaintiff filed her original complaint in April 2006, and she filed her most recent version, the Third Amended Complaint, on January 24, 2012. She seeks treble damages as well as civil penalties for the federal and state FCA violations.

## II.

### A.  Plaintiff's *Qui Tam* Claims

Pursuant to the FCA, private persons, known as "relators," may file *qui tam* actions and recover damages on behalf of the United States. Congress recently enacted the Fraud Enforcement Recovery Act of 2009 ("FERA"), which amended and renumbered the FCA. *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-22. Only certain FCA provisions apply retroactively to plaintiff's claims, which were filed in April 2006. *See id.*; *United States ex rel.*

*Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 131 S.Ct. 1885 (2011). Because § 3729(a)(1)(A) does not apply retroactively, the former provision (§ 3729(a)(1)) applies and establishes liability for "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." However, § 3729(a)(1)(B) (formerly § 3729(a)(2)), does apply retroactively and establishes liability for "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." Finally, because § 3729(a)(1)(C) does not apply retroactively, the former provision (§ 3729(a)(3)) applies and establishes liability for "conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid." *See* FERA § 4(a), 123 Stat. at 1621; *see also Kirk*, 601 F.3d at 113; *United States ex rel. Walner v. NorthShore Univ. Healthsystem,* 660 F. Supp. 2d 891, 896 n.3 (N.D. Ill. 2009*); United States ex rel. Moore v. Cmty. Health Servs.*, 09-cv-1127, 2012 WL 1069474, at *4 (D. Conn. Mar. 29, 2012).

The Second Circuit has recognized that § 3729(a)(1) requires a plaintiff to show "that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Kirk*, 601 F.3d at 113 (quoting *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001)). A false or fraudulent claim is one "aimed at extracting money the government otherwise would not have paid." *Mikes*, 274 F.3d at 696. The wrongful activity must be linked "to the government's decision to pay." *Id.* Section 3729(a)(1)(B) does not, however, require "proof that the defendant caused a false record or statement to be presented or submitted to the Government but that the defendant made a false record or statement for the purpose of getting a false or

4

fraudulent claim paid or approved by the Government." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) (internal quotation marks omitted) (referencing former § 3729(a)(2)).

### 1. Pleading Standard for *Qui Tam* Claims

Defendants' primary argument is that plaintiff has not pled her *qui tam* claims with the particularity required by Federal Rule of Civil Procedure 9(b). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard is "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit," *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation marks omitted), in addition to "discourag[ing] the filing of complaints as a pretext for discovery of unknown wrongs," *Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (internal quotation marks omitted).

Claims brought under the FCA, as well as its state analogue, must comply with Rule 9(b)'s heightened pleading standard. *See Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995); *United States ex rel. Polansky v. Pfizer, Inc.*, 04-cv-704, 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009). To satisfy this standard, a complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wood v. Applied Research Assocs.*, 328 F. App'x 744, 747 (2d Cir. 2009) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)) (internal quotation marks omitted);

*see also United States v. Dialysis Clinic, Inc.*, 09-cv-710, 2011 WL 167246, at *9 (N.D.N.Y. Jan. 19, 2011) ("Where a complaint fails to specify the time, place, speaker and content of the alleged misrepresentations, it will lack the particulars required by 9(b)."). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *Polansky*, 2009 WL 1456582, at *4 (FCA case) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)) (internal quotation marks omitted).

Because the Second Circuit has not explained exactly what Rule 9(b) demands of FCA claims, several courts have relied on a standard articulated by the First Circuit:

> As applied to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity—specifying the "time, place, and content" of the alleged false or fraudulent representations—means that a relator must provide details that identify particular false claims for payment that were submitted to the government. . . . [D]etails concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However, . . . some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b).

*United States ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 232-33 (1st Cir. 2004) (internal quotation marks omitted), *abrogated on other grounds by Allison Engine Co.*, 553 U.S. 662; *see United States v. Huron Consulting Grp.*, 09-cv-1800, 2011 WL 253259, at *2 n.2 (S.D.N.Y. Jan. 24, 2011) (quoting *Karvelas*); *Polansky*, 2009 WL 1456582, at *4 (same). Though "[u]nderlying schemes and other wrongful activities that result in the submission of

fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)," these "pleadings invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action." *Karvelas*, 360 F.3d at 232; *see also Dialysis Clinic*, 2011 WL 167246, at *10 ("[A]llegations of violations of federal regulations are insufficient to establish a claim under the FCA if plaintiff cannot identify, with any particularity, the actual false claims submitted by the defendant." (citing *Johnson v. Univ. of Rochester Med. Ctr.*, 686 F. Supp. 2d 259, 265 (W.D.N.Y. 2010))).

There are a few situations in which the stringent requirements of Rule 9(b) may be relaxed. The Second Circuit applies a relaxed pleading standard when a plaintiff is not in a position to know specific facts until after discovery and "when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). Yet the complaint must still "adduce specific facts supporting a strong inference of fraud" to satisfy Rule 9(b); "bas[ing] claims of fraud on speculation and conclusory allegations" is not enough. *Id.* Pleadings based upon information and belief "must be accompanied by a statement of the facts upon which the belief is based." *Di Vittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Courts in this Circuit have also relaxed the pleading requirement "in cases involving complex fraudulent schemes or those occurring over a lengthy period of time and involving thousands of billing documents." *United States ex rel. Tiesinga v. Dianon Sys.*, 231 F.R.D. 122, 123 (D. Conn. 2005); *see also United States ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 313, 326 & n.70 (S.D.N.Y. 2004).

## 2. Application

Plaintiff alleges two discrete fraudulent schemes, one in which defendants obtained patients by paying kickbacks to third-party vendors in exchange for referrals, and one in which defendants altered documents to justify unnecessary home health services.

### a. Whether the Alleged Fraudulent Referral Scheme Satisfies Rule 9(b)

Plaintiff alleges that defendants paid kickbacks to third-party vendors Royal and Immediate in exchange for referring patients for home health services. She asserts that "many" of Americare's patient referrals were from Royal and Immediate, rather than from doctors or hospitals as is more typical. TAC ¶ 49. She alleges that Americare provided cash payments and/or agreed to use the referring vendor's home health aides to provide the services, *id.* ¶ 50, constituting illegal rewards and inducements under Medicare's Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b). She alleges generally that defendant Inzlicht, Director of Intake Alla Goldin, ten intake coordinators, and Immediate and Royal employees participated in this illegal referral scheme. *See generally* TAC ¶¶ 51-67. The greatest detail relates to Izlicht's role in the scheme, but even those allegations are vague and unconnected to specific claims. *See id.* ¶ 54 ("Inzlicht would recruit patients for referral to the certified home health agency Americare even though the patient did not have a need for skilled care. Inzlicht knew that if she could obtain a referral of a patient, Americare would find a physician to certify that the patient had a need for skilled care."). Plaintiff identifies 16 claims that were allegedly submitted to Medicare as part of this scheme. *See id.* ¶¶ 69-70. She describes these claims as involving Patients A through P, with the first 6 referred from Royal and the next 10 referred from Immediate. *See id.* The only other details provided about the specific claims are the "certification" start and end dates. *See id.* Plaintiff claims that this scheme contributed to

a dramatic increase in patient admissions between 2003 and 2005. *Id.* ¶¶ 48, 56, 60.

Defendants correctly assert that the Third Amended Complaint fails to plead with particularity the "who, what, when, where and how" of the fraudulent referral scheme. *Polansky*, 2009 WL 1456582, at *4. She does not provide patient names, claim numbers, dates of services, claim amounts, or reimbursement amounts, if any.[2] The complaint alleges violations of the Anti-Kickback Statute but does not identify the specific payers or recipients of these kickbacks. Plaintiff vaguely refers to numerous participants in this alleged scheme but does not identify what specific roles they played or what false claims they submitted. *See Wood*, 328 F. App'x at 749 (dismissing the complaint under Rule 9(b) where plaintiff provided only conclusory allegations and "collective generalizations," and described each defendant "either with no specific allegations as to a given defendant's involvement, or with vague or generalized allegations as to a given defendant's involvement" (citations omitted)); *see also id.*

---

[2]Plaintiff explains that she did not plead the patients' names or identifying data to protect their privacy. The Court agrees with this privacy concern and does not construe Rule 9(b) as requiring plaintiff to plead the patients' names. *See Tiesinga*, 231 F.R.D. at 123 (stating that the government "need not specify in its complaint or even in an attachment to the complaint each specific bill that it claims is false" as this "would raise serious privacy concerns for patients"). Nevertheless, concern for patient privacy does not lessen the standard for compliance with Rule 9(b). Plaintiff could theoretically have protected the patients' privacy while pleading with sufficient particularity. Here, plaintiff obtained a protective order to enable her to identify the patients while protecting their privacy. Alternatively, plaintiff could have provided the details to defendants in a separate document, *see In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 336-38 (D. Conn. 2004) (finding Rule 9(b) satisfied where the government provided categorical information about the claims in the complaint and provided a detailed list of the procedures under separate cover to protect patient confidentiality), or by illustrating the allegations in the complaint "with a number of specific exemplars (without providing personal identifying information)," *Tiesinga*, 231 F.R.D. at 123-24. In any event, plaintiff's counsel conceded at oral argument that plaintiff does not have additional details about the specific claims in the fraudulent referral scheme. Thus, patient privacy concerns are not the reason for the Court's dismissal of this scheme.

at 750 (quoting approvingly from the district court's opinion, which noted that the complaint "do[es] not cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time" (quoting *Wood ex rel. United States v. Applied Research Assocs.*, 07-cv-3314, 2008 WL 2566728, at *5 (S.D.N.Y. June 26, 2008))).  Moreover, many of the alleged participants in the scheme are not defendants in this case, making it even more important that the complaint connect the alleged wrongful conduct to the named defendants. Plaintiff's collective references to the three corporate defendants as "Americare" further obfuscate the specific roles played by each defendant.

Plaintiff provides certification start and end dates, but these dates do not correspond to key information regarding the claims, such as the dates of service or the dates of claim submission.  Though plaintiff informed the Court that she would "add information about at least 100 specific claims including dates of service, . . . whether the claim was paid and the amount of any reimbursement," Pl.'s Letter, Dec. 29, 2011, she mentioned only 28 claims in her Third Amended Complaint.  Only 16 of these claims relate to the fraudulent referral scheme), and she failed to provide the key details of even these claims.  Plaintiff has thus failed to plead the fraudulent referral scheme with the requisite particularity.  *See Tiesinga*, 231 F.R.D. at 123 (directing the government to replead where it had provided only "a general description of the working of the alleged scheme" but did not specify the date or content of any particular claim, list the allegedly unnecessary antibodies, or identify the amounts wrongfully charged).

Though plaintiff asserts that Americare's patient population increased, she has

10

not alleged a kickback scheme involving specific claims with sufficient particularity. Plaintiff insists that Rule 9(b) requires only a particularized description of the fraudulent scheme but not particularized descriptions of any of the false claims submitted pursuant to that scheme. The Court declines to take such a lenient view of Rule 9(b)'s heightened pleading requirement. *See United States ex rel. Smith v. N.Y. Presbyterian Hosp.*, 2007 WL 2142312, at *5 (S.D.N.Y. 2010) ("Although [plaintiff] manages to sketch out the nature of that claim by generally stating the 'who, what, where, when and how' of his theory of fraud, he fails to provide sufficient detail about that theory or about any specific fraudulent claim.").

Moreover, plaintiff does not ask the Court to apply a relaxed pleading standard, nor does she allege facts that would support the application of such a standard. A relaxed standard may be appropriate where the plaintiff contends that the pertinent facts are solely in defendants' possession. This typically applies in cases where the plaintiff-relator never had access to billing information. Here, by contrast, plaintiff worked in the billing department of Americare, purports to have knowledge of the specific claims, and purports to have supporting documents. Plaintiff's counsel repeatedly asserted at oral argument that courts have allowed plaintiffs who do not have access to billing documents to plead just the fraudulent scheme in detail without pleading the specific false claims in detail. While this assertion is correct, it is inapplicable here. The lack of access to billing documents is precisely what triggers the relaxation of Rule 9(b)'s pleading standard. By contrast, this case represents the "archetypal *qui tam* FCA action"—one "filed by an insider at a private company who discovers his employer has overcharged under a government contract." *Polansky,* 2009 WL 1456582, at *8 (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)).

Here, where plaintiff has expressly disavowed any request for a relaxed pleading standard, she cannot benefit from a relaxed requirement to plead only the scheme (and not the underlying claims) with particularity.

The Court recognizes that "Rule 9(b) does not impose a 'one size fits all' list of facts that must be included in every FCA complaint." *In re Cardiac Devices Qui Tam Litig.*, 221 F.R.D. 318, 337-38 (D. Conn. 2004). Nevertheless, the Third Amended Complaint does not contain sufficient information. *See Polansky*, 2009 WL 1456582, at *5 (emphasizing that "a relator cannot circumscribe the Rule 9(b) pleading requirements by alleging a fraudulent scheme in detail and concluding, that as a result of the fraudulent scheme, false claims must have been submitted" (citing First, Third, Tenth, and Eleventh Circuit cases)). Accordingly, defendants' motion to dismiss the *qui tam* claim is granted as to the alleged fraudulent referral scheme.

Although plaintiff requested leave to amend her complaint in a footnote in her memorandum opposing summary judgment, plaintiff's counsel conceded at oral argument that plaintiff cannot provide additional specificity as to the fraudulent referral scheme and confirmed that plaintiff is not asking the Court to apply a relaxed pleading standard. In light of these admissions, the Court finds that an amendment would be futile and thus declines to grant plaintiff leave to amend. *See Leonelli v. Pennwalt Corp.*, 887 F.2d 1195, 1198 (2d Cir. 1989) ("Although leave to amend a pleading under the Federal Rules of Civil Procedure 'shall be freely given when justice so requires,' Fed.R.Civ.P. 15(a), such leave will be denied when an amendment is offered in bad faith, would cause undue delay or prejudice, or would be

futile.").[3]

**b.     Whether the Alleged Fraudulent Alteration Scheme Satisfies Rule 9(b)**

Plaintiff alleges a separate scheme in which defendants fraudulently altered medical records to justify unnecessary home health services.

As an initial matter, defendants point out that plaintiff has not specified a single claim that was submitted to Medicaid and thus the broad allegations relating to Medicaid must be dismissed.  Indeed, all 28 of the specific claims alleged in the Third Amended Complaint, including the 12 exemplars of the fraudulent alteration scheme, relate to submissions to Medicare.  Plaintiff responds that "there is no reason to doubt that claims were submitted to state Medicaid programs."  Pl.'s Mem. Opp. Sum. J. 19.  The Court agrees with defendants that plaintiff's broad, conclusory allegations regarding Medicaid fall short of the standard required by Rule 9(b).  *See Polansky*, 2009 WL 1456582, at *5 ("[A] relator cannot circumscribe the Rule 9(b) pleading requirements by alleging a fraudulent scheme in detail and concluding, that as a result of the fraudulent scheme, false claims must have been submitted.").  Since plaintiff has failed to allege any specific claims relating to Medicaid, the Court finds that plaintiff has failed to satisfy the heightened pleading standard as to Medicaid claims allegedly made pursuant to the fraudulent alteration scheme.  Moreover, the Court declines to grant plaintiff leave to amend her complaint because plaintiff has not indicated that she will be able to identify any claims related to Medicaid.  *See Leonelli*, 887 F.2d at 1198;

---

[3]Because the Court dismisses plaintiff's fraudulent referral claim with prejudice, there is no need to address defendants' alternative grounds for dismissal.  Similarly, because the complaint only alleges a conspiracy in connection with the referral scheme, there is no need to determine whether plaintiff has sufficiently alleged the elements of a conspiracy.

*Dialysis Clinic*, 2011 WL 167246, at *21 ("While it is true that dismissals for failure to comply with Rule 9(b) are often without prejudice, plaintiff must offer a reason or suggestion as to how he may provide details to the claims made against defendant before leave will be granted.").

In contrast, the Court finds that plaintiff has sufficiently alleged the fraudulent alteration scheme relating to Medicare claims. The Third Amended Complaint identifies twelve examples of such conduct—in much greater detail than the fraudulent referral examples. *See* TAC ¶¶ 103-04. These twelve exemplars adequately describe the "what" element of the alteration scheme by identifying the claims with specific details. Many of these claims describe the people implicated (the "who") and the precise manner in which the records were altered (the "how"). The claims also identify the "when" by providing the date of the original order, the date of the alteration of the order, the date the claim was released to billing, or the date that the claim was actually submitted. For example:

> Patient Z: Patient Z's medical records also include fraudulent documentation. On May 13, 2005, Ms. Mooney filled out a Supplemental Physician Order Form for Patient H. This Order was signed by Dr. Hussain Syed on July 12, 2005 and returned to Americare. After this Order was received with Dr. Syed's signature, the Order was modified to add a line, not written in Ms. Mooney's handwriting, into the previously blank "service charges" section of the form. The Order was modified to prescribe home health visits once a day for two weeks, twice a week for one week and every other week for five weeks.

TAC ¶ 103; *see id.* at ¶ 104 (indicating five "release to billing dates" for Patient Z's claims).

Defendants contend that plaintiff's allegations fall short of Rule 9(b)'s standard. They claim that she has only identified patients by letter, rather than by name or claim number. Defendants point out that the claims do not always identify the employee involved.

They also contend that though plaintiff provides certain dates, she does not provide the actual dates of service. She also does not identify the claim or reimbursement amounts.

Although defendants correctly assert that plaintiff has not identified every conceivable detail of every claim identified, plaintiff has pled enough facts to satisfy Rule 9(b). In particular, the Court finds that the paragraph-style descriptions of the claims and the billing release dates identify the claims with the particularity envisioned by Rule 9(b).[4] The Second Circuit has recognized that Rule 9(b)'s heightened pleading requirement is intended to provide notice to defendants, to prevent reputational harm due to baseless charges, and to discourage fishing expeditions. *See O'Brien*, 936 F.2d at 676; *Madonna*, 878 F.2d at 66. In contrast to the fraudulent referral scheme, the Court is satisfied that the specific claims alleged pursuant to the fraudulent alteration scheme comport with the purposes of Rule 9(b).[5]

Moreover, as the First Circuit has stated, there is no "checklist of mandatory requirements that must be satisfied by each allegation included in a complaint"; only "some" of the information regarding dates, amounts, people involved, submission, and duration "for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." *Karvelas*, 360 F.3d

---

[4]Plaintiff's counsel represented at oral argument that plaintiff can provide additional information, such as names and claim numbers, for the fraudulent alteration claims in a Fourth Amended Complaint; however, the Court finds that the provision of this information is not strictly necessary at this stage in light of the privacy concerns stated above and the claim details already outlined in the Third Amended Complaint.

[5]Defendants argue that no fraud is alleged as to Patient T. Plaintiff alleges that Patient T's order form was copied onto an order for Patient B. *See* TAC ¶ 103. Because Patient T's form is implicated in the alleged fraud, this claim may proceed for purposes of determining whether a fraudulent claim was submitted as to Patient B.

Defendants also argue that the claims regarding Patients Y and Z are flawed because plaintiff alleges final release to billing dates in 2004 even though the alleged conduct occurred in 2005. *See* TAC ¶¶ 103-04. Defendants mischaracterize plaintiff's allegations since plaintiff alleges billing dates in both 2004 and 2005.

at 232-33. Plaintiff has pled particular facts for twelve specific claims of fraudulent alteration. Although plaintiff has not identified every false claim allegedly filed pursuant to the fraudulent alteration scheme, the Court finds that she has pled twelve specific claims with sufficient particularity to justify permitting the whole fraudulent alteration scheme pertaining to Medicare claims to survive the motion to dismiss. *See United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003) (noting that the "12 files adequately provide the specificity required in complex fraud cases, even if these patients' cases are only exemplary"); *cf. Tiesinga*, 231 F.R.D. at 124 (directing the government "to amend its complaint to provide further specifics regarding the operation of the alleged scheme, along with exemplars showing the manner in which the scheme worked in individual instances"). Based upon the twelve exemplars, defendants have notice of the relevant time period, the nature of the alterations, where the alterations occurred, and many of the people involved.[6] *See United States ex rel. Bledsoe v. Community Health Sys.*, 501 F.3d 493, 510-11 (6th Cir. 2007) (holding that a relator must provide "*representative samples* of the broader class of claims" to enable the defendant "to infer with reasonable accuracy the precise claims at issue . . . , thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing relators to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements"); *In re Cardiac Devices*, 221 F.R.D. at 338 (noting that "defendants have been provided with fair notice of the substance of the claims against them").

---

[6]Because none of the twelve exemplars represent claims made to Medicaid, the exemplars do not provide defendants with notice of any Medicaid claims. Thus, as stated above, the scheme is insufficiently pled as it relates to Medicaid.

Accordingly, the Court finds that plaintiff has alleged a fraudulent alteration scheme relating to Medicare claims in sufficient detail to meet Rule 9(b).[7]

## B.  Plaintiff's Retaliation Claim

Defendants next move to dismiss plaintiff's retaliation claim.  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court accepts all non-conclusory factual allegations as true and draws all reasonable inferences in plaintiff's favor.  *See id.* at 678-79.  Rule 9(b)'s heightened pleading standard does not apply to plaintiff's FCA retaliation claim since no showing of fraud is required.  *See Garcia v. Aspira of New York, Inc.*, 07-cv-5600, 2011 WL 1458155, at *3 n.1 (S.D.N.Y. Apr. 13, 2011).

To sustain an action for retaliatory discharge under 31 U.S.C. § 3730(h) of the FCA, a plaintiff must establish: "(1) that she engaged in conduct protected under the statute; (2) that defendants were aware of her conduct; and (3) that she was terminated in retaliation for that conduct."  *Johnson*, 686 F. Supp. 2d at 268; *see also* 31 U.S.C. § 3730(h).

First, defendants contend that only Americare CSS employed plaintiff, and thus the retaliation claim must be dismissed against the other five named defendants.  Plaintiff's counsel conceded at oral argument that the retaliation claim must be dismissed as asserted against the three individual defendants.  "Section 3730(h) imposes liability only on

---

[7] Because the New York FCA is "closely modeled on the federal FCA," *Dialysis Clinic*, 2011 WL 167246, at *21, the Court's analysis applies to the state claims as well.

employers." *Fisch v. New Heights Acad. Charter Sch.*, 12-cv-2033, 2012 WL 4049959, at *4 (S.D.N.Y. Sept. 13, 2012). Since the FCA does not define "employer," its ordinary meaning governs. *See id.* Thus, only the corporation is the employer, and only the corporate defendants may be held liable for a retaliation claim. *See id.* (noting that the "overwhelming balance of authority" bars § 3730(h) claims against individual defendants).[8]

Although plaintiff's complaint alleges that she worked only for Americare CSS, *see* TAC ¶ 8, her complaint also refers to the corporate defendants collectively as "Americare" and alleges common ownership, *id.* ¶¶ 13-15. Plaintiff's counsel argued that the retaliation claim should not be dismissed against Americare, Inc. and Americare Therapy Services based on the common ownership, common management, and lack of meaningful separation. Accepting plaintiff's allegations and drawing inferences in her favor, the complaint sufficiently states a retaliation claim against Americare, Inc. and Americare Therapy Services.[9]

Second, defendants contend that plaintiff's retaliation claim must be dismissed because plaintiff admits she was terminated due to a personality conflict with Americare's Director of Patient Services. *See id.* ¶ 113. Though plaintiff admits that she was terminated due to an "alleged" personality conflict, *see id.*, she contends that "retaliation for her efforts to report and correct systemic fraud and submission of false or fraudulent claims" was the actual

---

[8]In 2009, Congress amended this provision to exclude the term "employer," *see* Pub. L. 111–21, § 4(f) (1), (2), prompting at least one district court in this Circuit to hold that FCA retaliation claims may now proceed against individuals, *see Moore*, 2012 WL 1069474, at *9. Nevertheless, this provision does not apply retroactively, and the alleged conduct took place well before 2009. *See Fisch*, 2012 WL 4049959, at *4. Thus, the earlier version governs, and plaintiff's retaliation claim shall not proceed against the individual defendants.

[9]Defendants may renew their argument to dismiss these entities at the summary judgment stage if plaintiff is unable to adduce proof of an employment relationship.

reason for her dismissal, *id.* at ¶ 114. She alleges that she sent a memorandum to her supervisors in August 2005 describing incidents of medical record alteration and characterizing it as "clearly Medicaid fraud." *Id.* at ¶¶ 91, 111. After pushing for more thorough chart audits, she received her first negative performance review. *Id.* at ¶¶ 91, 96. Plaintiff asserts that she was then relieved of any duties involving the review of Medicare billing, that the billing cabinets were double-locked, and that she was terminated in December 2005. *Id.* at ¶¶ 111-13. Drawing all reasonable inferences in plaintiff's favor, she has alleged facts that, if proven, would permit a reasonable jury to conclude that she was terminated in retaliation for her conduct.

Third, defendants argue that plaintiff has not alleged that she notified her employer that she was engaged in protected activity. Under the version of § 3730(h) in effect at the time of the alleged conduct, protected conduct was defined as "acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." The term "protected activity" is "interpreted broadly" under the FCA. *See* S. Rep. No. 345, 99th Cong., 2d Sess. 34, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299. While "[m]ere investigation of an employer's non-compliance with the federal regulations is not enough" to constitute protected conduct under § 3730(h), a plaintiff does not need to know that her investigation could lead to a *qui tam* suit. *Fisch*, 2012 WL 4049959, at *5. Plaintiff "must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423 (D.C. Cir. 2005) (citation omitted); *see also United States ex rel. Smith v. Yale Univ.*, 415 F. Supp. 2d 58, 103–04 (D. Conn. 2006) (stating that

conduct is protected "when a potential plaintiff engages in an investigation in which it would be reasonable to conclude that there is a 'distinct possibility' that he or she would find evidence of an FCA violation"). Further, "[i]nternal reporting has been held to constitute protected activity." *Smith*, 415 F. Supp. 2d at 105.

Defendants contend that plaintiff's reporting of improper billings to her supervisors was done in furtherance of her own job responsibilities and not in furtherance of an FCA action. At the motion to dismiss stage, however, it is sufficient for a plaintiff—even one employed to investigate her employer's financial practices—to allege that she was "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Fisch*, 2012 WL 4049959, at *5-6 (citation and internal quotation marks omitted) (quoting *Shekoyan*, 409 F.3d at 423) (rejecting defendants' argument that plaintiff's "actions do not constitute 'protected conduct' because, in investigating the School's finances and audit procedures, he was simply acting in his capacity as COO"). Plaintiff identifies three administrators to whom she reported conduct constituting Medicaid fraud. *See* TAC ¶¶ 81, 89, 91. She alleges that she sent two memoranda regarding the alterations and advocated for more thorough chart audits. *Id.* ¶ 91. The administrators responded by promising to investigate, writing a memorandum documenting billing problems, and obtaining external audits. *See id.* ¶¶ 93-94, 97. Plaintiff also alleges that two nurses were terminated in response to her reports. *Id.* ¶ 111. Accepting plaintiff's allegations as true and drawing all reasonable inferences in her favor, a reasonable jury could conclude that plaintiff was investigating matters that were calculated or reasonably could lead to an FCA action.

Finally, defendants argue that plaintiff has failed to allege any claims relating

to the limited services provided by her employer (i.e., services to people with developmental disabilities), thereby failing to allege a causal connection between her protected activity and her retaliation. The Court disregards this argument since it fails to explain how the type of services that Americare provides to its clients is relevant to the causation element of plaintiff's retaliation claim.

Accordingly, plaintiff's retaliation claim shall proceed against the three corporate defendants.

## IV

For the reasons stated above, defendants' motion to dismiss is granted in part and denied in part. The *qui tam* claim relating to the fraudulent referral scheme is dismissed with prejudice for failure to comply with Rule 9(b)'s heightened pleading requirement. The *qui tam* claim relating to the fraudulent alteration scheme (as it pertains to Medicare) and the FCA retaliation claim will proceed.

**SO ORDERED.**

_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 29, 2013